## KLEBERG & CO., Inc., v. UNITED STATES.
## No. 3582.

Court of Customs and Patent Appeals.
May 22, 1933.

Wm. L. Wemple, of New York City, for appellant.

Charles D. Lawrence, Asst. Atty. Gen. (John F. Kavanagh, Sp. Atty., of New York City, of counsel), for the United States.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant imported certain safety matches of the "strike-on-the-box" variety and entered the same at the port of New York on May 8, 1929. The shipment originated in Austria but was reshipped from Sweden. On March 23, 1931, the Secretary of the Treasury issued an order, T. D. 44718, 59 Treas. Dec. 642, as follows:

"To Collectors of Customs and Others Concerned:

"After due investigation in accordance with the provisions of section 201, antidumping act, 1921, I find that the industry of manufacturing safety matches of the strike-on-box type in the United States is being and is likely to be injured by reason of the importation into the United States of safety matches of the strike-on-box type from Austria, and that such safety matches of the strike-on-box type have been sold and are likely to be sold in the United States at less than their fair value."

After this importation was received, the local appraiser, under the provisions of section 201 (b) of the Anti-Dumping Act of 1921, 42 Stat. 11 (19 USCA § 160 (b), notified the Secretary of the Treasury, under date of February 19, 1930, that he suspected dumping as to this importation. It was as a result of this notice that the order of the Secretary was issued which is above quoted. Said section 201 (19 USCA § 160) appears in a marginal note.[1]

After the issuance and promulgation of the said order of the Secretary, the local collector fixed an anti-dumping duty upon said merchandise under the provisions of section 202 of said Anti-Dumping Act (19 USCA § 161).

Thereupon the importer appealed to reappraisement, and the matter came on to be heard before Judge McClelland of the United States Customs Court. In the initiation of the proceedings before the single judge, the attorney for the importer simplified the issue by making the following statement:

"* * * In this case, if the court please, I will concede that if there were any warrant in law for the making thereof, the action of the appraiser in finding foreign-market value of the merchandise in this case is correct. I would further concede, subject to the same conditions, that if there were any warrant in law for the making thereof, the appraiser's calculation of the importer's sales price or exporter's sales price, whatever he did compute, is also correct, and I will further concede, subject to the same conditions, that the appraiser has correctly performed the arithmetical computation in subtracting one figure from the other. This concession is confined to this case only. It does not extend to any other case or any other issue.

"I propose to try only one point in view of the concession I have just put on the record, and that is that the Secretary of the Treasury in making the alleged dumping finding in this case acted illegally and outside the powers conferred upon him by the statute."

The case was tried upon that issue before the single judge, who, after hearing the parties, sustained the contention of the importer and found a dutiable value equal to the entered values. The Government petitioned for a review, which was duly heard by the Second Division of the United States Customs Court. The Appellate Division reversed the judgment of the single judge and sustained the imposition of the dumping duty. From that judgment the importer has appealed.

In this court the appellant assigns several grounds of error, but its particular contentions are these: First, that the Secretary of the Treasury had no facts before him upon which he was justified in issuing the anti-dumping order in question; second, that the court below erred in not finding that it could judicially investigate the facts which were the basis of the Secretary's order; third, that the Secretary had no legal right to define the phrase "fair value" by means of a Treasury regulation, and that where such a regulation is made, it is not binding upon a court which reviews it; fourth, that the court below and this court should give a judicial construction to the phrase "fair value" as applied to the facts in this case; fifth, that the order of the Secretary was void as ultra vires, and that if it was within his statutory powers, the act authorizing it is unconstitutional and of no effect.

Various other suggestions are made, but these are the essential points involved.

---

[1] "Sec. 201. (a) Whenever the Secretary of the Treasury (hereinafter called the 'Secretary'), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

"(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the appraiser or person acting as appraiser has reason to believe or suspect, from the invoice or other papers or from information presented to him, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the cost of production) he shall forthwith, under regulations prescribed by the Secretary, notify the Secretary of such fact and withhold his appraisement report to the collector as to such merchandise until the further order of the Secretary, or until the Secretary has made public a finding as provided in subdivision (a) in regard to such merchandise."

On the hearing before Judge McClelland, the importer called three witnesses: Edward J. Dougherty, customs agent of the Treasury Department; Edwin Kleberg, treasurer and president of the importer; and Andrew W. Mellon, Secretary of the Treasury. In substance, Dougherty testified that in 1929 he received certain instructions from the Treasury Department, as a result of which he investigated the subject of dumping matches in the United States and injury to American industry thereby. He interviewed certain persons in the custom house in New York, and certain persons representing domestic match interests. When this agent's investigation was completed, his report was duly forwarded to the Secretary, through the Commissioner of Customs, in November or December, 1929. The contents of this report were considered confidential by the witness and were so held to be by the trial judge; however, the witness did testify at some length as to a comparison between prices of these and competitive American products in the markets of this country.

The witness Kleberg testified, in a general way, as to the selling prices of these and similar domestic matches in the markets of the United States. The attempt here, by the importer, was to establish what he designated as a "just price" for the imported product, in the markets of the United States, at that time.

The witness Mellon testified that he remembered the issuance of said order of March 23, 1931, T. D. 44718; that he caused an investigation to be made relative to the prices at which matches imported from Austria were sold in the United States in 1929, 1930, and 1931, by the witness Dougherty and the anti-dumping unit of the Customs Department. He further stated that he consulted with the assistant secretary in charge of the case, had the files, and familiarized himself with the facts and some of the arguments of counsel. In addition to acquainting himself with the files, he stated that he went further and discussed the matter with his assistant and with the undersecretary, and thereafter signed the order personally.

The Secretary stated that in ascertaining what the "fair value" of the imported matches was, he considered Treasury Regulations, article 712, 1923 Cust. Reg. 370, and applied the meaning of said article to said words. Said article appears in a marginal note.[2]

On March 27, 1931, counsel for the importer addressed a letter to the Treasury Department asking for permission to inspect the evidence "and other representations" upon which the Secretary acted. So far as the record shows, no such permission was granted. It fairly appears from the record that such failure to grant such permission was due to the fact that the Secretary considered such matters confidential.

It appears, therefore, that the Secretary of the Treasury did make such investigation as he thought necessary; that he did find that an industry in the United States, namely, the business of manufacturing safety matches of the strike-on-box type in the United States, is being, or is likely to be, injured by reason of the importation into the United States of matches of that type from Austria; that such goods "have been sold," or are likely to be sold, in the United States at less than their fair value.

It further appears that he made such finding public to the extent he deemed necessary, together with a description of the merchandise to which it applied, in such detail as was necessary for the guidance of the appraising officers.

Thus every statutory step required by the law was taken by the Secretary and customs officials in imposing the anti-dumping duty here involved.

█ In view of the recent decisions of the United States Customs Court, this court, and of the Supreme Court of the United States in similar cases, it cannot now be doubted that the Congress was within its constitutional powers in enacting this statute, section 201, Anti-Dumping Act of 1921 (19 USCA § 160). The Congress has laid down "by legislative act an intelligible principle" to which the Secretary of the Treasury is directed to conform, and, therefore, such legislative action is not a forbidden delegation of legislative power. Hampton & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624, affirming 14 Cust. App. 350; United States v. Blandamer, 20 C. C. P. A. (Customs) 45, T. D. 45676, certiorari denied, 287 U. S. 628, 53 S. Ct. 81, 77 L. Ed. 545; United States v. Leon & Co., 20 C. C. P. A. (Customs) 49, T. D. 45677, certiorari denied, 287 U. S. 628, 53 S. Ct. 83, 77 L. Ed. 545; Foster & Co. v. United States, 20 C. C. P. A. (Customs) 15,

---

2 "Art. 712. Unfair value.—Merchandise is sold at less than its fair value within the meaning of section 201 (a) of the act if the purchase price or exporter's sales price of such merchandise is less than its foreign-market value (or cost of production)."

T. D. 45673; United States v. Fox River Butter Co., 20 C. C. P. A. (Customs) 38, T. D. 45675, certiorari denied, 287 U. S. 628, 53 S. Ct. 83, 77 L. Ed. 545; United States v. Sears, Roebuck & Co., 20 C. C. P. A. (Customs) 295, T. D. 46086.

It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and within the law. United States v. Sears, Roebuck & Co., supra; Clarke v. United States, 17 C. C. P. A. (Customs) 420, T. D. 43866; United States v. Tower & Sons, 14 Cust. App. 421, T. D. 42058; United States v. Central Vermont Railway Co., 17 C. C. P. A. (Customs) 166, T. D. 43474.

This being the state of the law, we are not at liberty here to go into an investigation as to whether the facts shown on the trial below justified the issuance of the order complained of. Under the statute, the Secretary was not confined to any particular source of information or means of investigation. Furthermore, such information as he might obtain was not open to public inspection, unless he felt that the public interest so required. Norwegian Nitrogen Products Co. v. United States, 20 C. C. P. A. (Customs) 27, T. D. 45674, affirmed in 288 U. S. 294, 53 S. Ct. 350, 77 L. Ed. 796.

There is but one remaining question: Did the Secretary proceed upon a wrong theory of law when he established "fair value," under said section 201, on the basis of article 712 of the Treasury Regulations? That article provides that merchandise is sold at less than its fair value, within the meaning of said section 201 (a), if the purchase price or exporter's sales price of such merchandise is less than its foreign-market value (or cost of production).

This does not present a question of the validity of the regulation. The inquiry is, rather, did the Secretary exceed his authority when he construed the meaning of the words "fair value" to be as defined in said regulation. We are unable to so conclude. The apparent intent of the statute and the common meaning of the words used, both sustain the view of the reasonableness of such definition.

This statute was evidently intended to prevent the sale of foreign goods upon the markets of the United States at less than their foreign-market value in the country of exportation, or at less than their cost of production there, all as defined by said anti-dumping act. The fair value must, obviously, be intended to refer to their value in the country where they are produced. There does not seem to be anything unreasonable about the construction which the Secretary has placed upon the language "fair value." Discussing the Secretary's powers in United States v. Central Vermont Railway Co., supra, we said: "He has a broad and liberal discretion in the methods he shall adopt in finding his facts; he has no discretion after the facts are found. In finding the fair value of imported goods, he does no more than appraisers and collectors at the ports have been doing for many years."

It is argued that the secretary's order could not be retroactive and be made to apply to goods entered several months before the order was issued. However, the papers disclose that the appraisement was held in abeyance by the local appraiser upon this entry until after the Secretary's order was promulgated, in accordance with the provisions of said section 201 (b), 19 USCA § 160 (b). The goods were imported subject to the provisions of said act, and the importer's rights must be measured thereby.

The judgment of the United States Customs Court, Second Division, is affirmed.